IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| CRYSTAL LOUIS, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 8:10-cv-0078-AW |
| | * | |
| SUN EDISON, LLC, | * | |
| Defendant. | * | |
| | * | |

**************************************************************************

## MEMORANDUM OPINION

Pending before the Court is Defendant Sun Edison LLC ("Sun Edison")'s motion for summary judgment. *See* Doc. No. 23. The Court has reviewed the documents filed by the Parties and finds that no hearing is necessary. *See* Loc. R. 105(6) (D. Md. 2010). For the reasons that follow, the motion will be GRANTED in part and DENIED in part.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.  Plaintiff's Employment with Sun Edison

Plaintiff Louis Crystal began working for Sun Edison on June 18, 2008 as a Human Resources benefits manager. At Sun Edison, Plaintiff reported to Prasad Bathini, director of Human Resources. In turn, Bathini reported to Carole Jacolick, the vice president of Human Resources. Plaintiff's duties included structuring benefits information, putting together a standardized benefits package for employees, and paying benefits bills. She also participated in handling various concerns or complaints, including harassment and/or discrimination, by

employees. During her four-month tenure at Sun Edison, though Plaintiff never received a performance evaluation, she was quickly given supervisory responsibilities for two Human Resources employees, Michelle Knapp and Carl Kushinsky. Accordingly, she believes that her work was "exemplary." Doc. No. 35, Ex. 2 at 239-40.

B. <u>Sun Edison's Sexual-Harassment Policy and Complaint Procedure</u>

Sun Edison's sexual-harassment policy, found in its Employee Handbook ("Handbook"), prohibits harassment in the workplace and off the premises. The Handbook also sets forth the complaint procedure: an employee who is facing sexual harassment is required to notify his or her manager or the Human Resources Department as soon as possible. The manager or the Human Resources employee who is notified of the sexual harassment is supposed to inform Jacolick of the complaint, and she would then commence an investigation. The Handbook further prohibits retaliation against employees who come forward in good faith to complain about harassment. During her orientation process, Plaintiff received a copy of Sun Edison's sexual-harassment policy and acknowledged that she had read it.

Sun Edison claims that Plaintiff was personally familiar with the policy of requiring employees to promptly report workplace-related problems to management. According to Sun Edison, Plaintiff effectively utilized the complaint procedure on one occasion to resolve a workplace-related dispute with another employee. Plaintiff and another Human Resources employee, Mel Hernandez, had a conflict at work, and Plaintiff complained to her superiors about what she perceived as harassment. In an email dated September 22, 2008, which was copied to Jacolick, Bathini, and Vicki Zeigler, Sun Edison's Deputy General Counsel, Plaintiff described Hernandez's "continuous hostility, comments, and unfriendly cold

demeanor/behavior" as "harassment," asked her to stop such behaviors, and requested a "talk" in the presence of Jacolick, Bathini and Zeigler to resolve the conflict. Doc. No. 23, Ex. H. In response, Jacolick and Bathini set up and held a meeting pursuant to Plaintiff's request.

Plaintiff describes Hernandez as a "brusque type of individual" and a "difficult employee" who was "mean and nasty all the time from day one" to Plaintiff. Doc. No. 35, Ex. 2 at 109, 111. However, she does not recall this incident as a "dispute" or an official harassment complaint so much as an attempt to "open a dialogue" to "address any concerns" between the two. *Id.* at 109-10. In any event, it is clear that the "harassment" at issue was not sexual harassment, and her complaint was therefore not a sexual-harassment complaint.

Plaintiff asserts that, although she was aware of Sun Edison's complaint procedures, she had seen firsthand how Sun Edison's sexual harassment policies were ineffective in practice. She lists several incidents that she believes demonstrate that Sun Edison threatened and retaliated against employees who complained about harassment, discouraged others from reporting harassment, and protected the offenders.

One case involved Kimberly Holt, who worked for Sun Edison as an executive assistant in 2008. Holt claims that one of Sun Edison's directors, Sergio Obadia, engaged in inappropriate behaviors against her. Holt sought Knapp from the Human Resources Department for advice on how to tell Obadia to stop. She chose to seek advice rather than making a formal complaint because she had concerns about the repercussions of reporting sexual harassment as a temporary employee fighting for a job. She testifies that Sun Edison "is a very manly company" and she "was the new girl on the block that might shake a few legs if I said anything." Doc. No. 35, Ex. 17 at 30.

According to Holt, Knapp told her, "I'm going to have to put it on record if you wanted me to do something. If you want me to say something to anybody, I have to put it on record. Otherwise, I didn't hear anything you said."[1] *Id.* at 23. Holt did not see Knapp's advice as helpful and decided to report to Sun Edison's Director of Emerging Markets, Len Jorlin, who referred her to Bathini.[2] However, she heard nothing further from Bathini or anyone else. A week later, Holt found out that Jorlin was looking to replace her. According to Holt, he told her that she was not qualified and he wanted somebody with more education. Holt maintains that prior to this incident, she had always received positive feedback about her job performance at Sun Edison. She claims that the she was terminated because she complained about Obadia's harassment: "[a]s soon as I opened my mouth, I was notified that I wasn't qualified anymore. I needed more education." *Id.* at 30.

Another case involved Renee Holland, who tried to meet with Jacolick on several occasions to discuss her harassment complaint against a senior vice president of Sun Edison. Jacolick allegedly "blew her off" each time and never met her. Doc. No. 35, Ex. 2 at 65. Eventually Jacolick asked Plaintiff to meet with Holland. Plaintiff investigated the complaint, met with the accused senior vice president of Sun Edison and ultimately urged the company to issue a written warning against the harasser.[3]

C.  Bathini's Alleged Sexual Harassment of Plaintiff

---

[1] According to Jacolick, Knapp was subsequently given a verbal warning for not reporting the incident to others, because Human Resources employees have a responsibility to report and investigate complaints.

[2] Furthermore, Plaintiff testified that she was aware of Holt's complaint during her employment at Sun Edison.

[3] However, Plaintiff maintains that Ziegler later scolded her for issuing a written warning to a senior management official and told Plaintiff that in the future she was not to issue any form of reprimands or warnings unless Zeigler was first consulted.

According to Plaintiff, when she began to work under Bathini, he was initially polite and cordial with her. However, Plaintiff testifies that he soon began to comment on her appearance, and these remarks quickly moved in a sexually explicit direction: "you look well. You smell good. You smell like how a woman should smell. Your lips are beautiful. Your hair is beautiful. You're wearing that skirt. You have a nice figure. You have nice round breast[s]." Doc. No. 35, Ex. 2 at 223.

Bathini denies making inappropriate remarks to Plaintiff. He claims that he would occasionally makes appreciative comments when an employee dresses well, such as "you look nice," "you look good today," "that's . . . a pretty dress," but that his remarks did not have sexual connotations. Doc. No. 35, Ex. 5 at 222-23.[4]

Plaintiff testifies that Bathini's sexual harassment against her soon escalated from inappropriate sexual comments into sexually suggestive gestures, after-hour calls to her blackberry and personal cell phone, and finally physical touching and assault. She recounts the following incidents in which Bathini allegedly harassed and assaulted her.

---

[4] Jacolick corroborates Bathini's account: according to her, Bathini regularly made innocuous comments such as "pretty earrings; my wife has some of those," "you look nice today," "that's a nice outfit," and "that's a nice sweater," but she did not hear any inappropriate or sexual comments from Bathini about another employee. Doc. No. 35, Ex. 4 at 122-25.

However, another employee, Paula Scherer, a paralegal for Kevin Lapidus, Sun Edison's General Counsel, testified that she felt uncomfortable at times around Bathini. Scherer recalls that Bathini took her to lunch one day and, although he did not say anything overtly inappropriate, Scherer got the distinct impression that the lunch was Bathini's way of "trying to feel me out in a way, so to speak, or see what possibly might be there." Doc. No. 35, Ex. 15 at 25. When Scherer worked late, she noticed that Bathini was visiting her cubicle frequently and staying for a long time, something he did not do with anyone else. On another occasion, she was working with him on a project in his windowless office on a work matter that was not sensitive; Bathini closed the door at a time when she deemed it unnecessary and inappropriate to do so. She also claims that Bathini made comments such as "you're an attractive girl," "you're a pretty girl," or "you're very pretty" to Scherer, making her uncomfortable. *Id.* at 27-28. Scherer testifies that Bathini stopped doing and saying things that made her uncomfortable around the time Plaintiff began working at Sun Edison.

In August 2008, Bathini allegedly smacked Plaintiff on her buttocks with an open hand. According to Plaintiff, Bathini "laughed and smirked and then held his pants up in a sexually offensive manner." Doc. No. 35, Ex. 2 at 147. Bathini, however, denies ever touching Plaintiff with his hand. He accounts for the August incident by claiming that a black notebook he was carrying must have accidently hit her as they were leaving the meeting. Bathini denies that he made a sexually suggestive facial expression and, insofar as Plaintiff saw him holding his pants up, he explains that he sometimes pulls his pants up when they are slipping from his waist.

On or about September 30, 2008, Plaintiff left work to run errands at Costco. According to Plaintiff, Bathini followed her to Costco, called her to determine her whereabouts, and asked to speak with her about one of her subordinates. He asked Plaintiff to follow him to his car and insisted that she sit inside with him. Plaintiff tried to keep the door open, but Bathini rolled up the windows and closed the door against her wishes. He told Plaintiff that he had a gift for her, and he pulled out a bag that contained the gift (Indian bracelets).

Then, prior to giving her the gift, Plaintiff claims that Bathini "attempted to touch my breast, and he grabbed my face to kiss me and had my face in his hands attempting to put his lips on my face and in my lip area" and "[h]e put his hands on my thighs, and he went again to touch my breast." *Id.* at 170. Plaintiff also recalls Bathini being "extremely forceful" in his touching and "somewhat agitated when he couldn't kiss my face." *Id.* at 171. Plaintiff then "jumped out of the car" and escaped. *Id.* at 170. While touching Plaintiff, Bathini allegedly told her that she was "doing a good job," and that she needed to fire Knapp. *Id.* at 171.

Bathini describes the Costco incident very differently. He maintains that he went to Costco to do some shopping at the request of his wife, and that he happened to run into Plaintiff

as she was leaving the store. He struck up a conversation with her because he wanted to give her some Indian bracelets as an appreciation gift for working hard on an insurance issue for the company. He invited Plaintiff to his car so that she could pick out which bangles she preferred. He denies ever attempting to assault or touch Plaintiff in the Costco parking lot.

A week later, on October 7, 2008, Plaintiff avers that Bathini walked to her cubicle and offensively gestured to her with his finger in his mouth, moving it in and out in a sexually suggestive manner, attempting to simulate oral sex. Bathini allegedly told Plaintiff that he wanted her to perform "this," referring to his gesticulation, and he asked her for a blow job. *Id.* at 162, 209. Plaintiff told him to stop. Shortly thereafter, Plaintiff documented the harassment in her calendar using shorthand: "harassed finger in the mouth." Doc. No. 35, Ex. 7.

On other occasions, Bathini allegedly commented to Plaintiff that he had marital problems, that his wife would not give him a blow job, and that he wanted Plaintiff to perform oral sex on him. According to Plaintiff, Bathini also told her that her life would be better if she performed oral sex on him.

Bathini counters each allegation with denials or partial alternative explanations. In response to the finger-in-mouth incident, he confesses that he has a bad habit of biting his nails. Furthermore, he reports that, at the time of the events in question, he had no idea what a "blow job" meant. Doc. No. 35, Ex. 5 at 248. He claims that he never told Plaintiff that he was in a loveless, nonsexual relationship with his wife, though he acknowledges that he may have told her that he needed to spend more time at home because he felt that he was neglecting his wife and children by working too late.

Plaintiff further alleges that on October 8, when she was working late, Bathini came to her cubicle to speak with her about her project. According to Plaintiff, Bathini "once again came over to my desk, sexually harassing me, rubbing my back, rubbing my hair, and touching my face, and grabbing my lips, pulling on my hand, and rubbing my shoulders." Doc. No. 35, Ex. 2 at 215. Plaintiff was very upset and angrily demanded that Bathini leave her alone. Bathini left the cubicle but quickly returned with tears in his eyes, telling Plaintiff that he would not bother her again. In her calendar, Plaintiff noted, "crying from him." Doc. No. 35, Ex. 7.

D. <u>Plaintiff Initially Does Not Report Bathini's Harassment to Management or the Human Resources Department</u>

Plaintiff alleges that Bathini had subjected her to ongoing sexual harassment throughout much of her tenure at Sun Edison. However, it is undisputed that she did not report these incidents to any of the mangers or Human Resources employees at Sun Edison until October 16, 2008. She explains the reporting delay with reference to her previous experiences and observations of Sun Edison's sexual-harassment policy, which left her hesitant regarding its efficacy and fearful of potential retaliation.

Nonetheless, she claims that she attempted to report her concerns to Jacolick on August 29, 2008. Plaintiff requested to speak with Jacolick, but she did not inform Jacolick that the topic she wanted to discuss was a sexual-harassment complaint. Jacolick told Plaintiff that she was too busy for a private appointment and asked Plaintiff to meet her in the lunchroom instead. The discussion took place in an open area with other people present; in fact, Bathini entered the room and allegedly glared at Plaintiff. As a result, Plaintiff opted not to report her concerns to Jacolick.

However, Plaintiff did confide to two co-workers, Shonne Spencer and Paula Scherer, about the ongoing sexual harassment. Neither of them were employees from the Human Resources Department or managers. Spencer states that he encouraged Plaintiff to report the harassment, but that she was reluctant to do so because she believed that management liked Bathini and would not support her if she came forward. Scherer testifies that she advised Plaintiff to speak to Kevin Lapidus, Sun Edison's General Counsel, about the harassment; Plaintiff indicated that she would consider Scherer's advice. Scherer and Plaintiff also discussed whether it would be viable to report to Jacolick; Plaintiff was uncertain about this route, because she suspected Jacolick would believe Bathini's word over hers.

In addition to these co-workers, Plaintiff also told her friend, Tiffany Kelley, about the situation. Kelley describes Plaintiff's concerns in the following way: "[S]he was fearful. She just didn't know what to do. She was very apprehensive of what decision to take next because -- you know, either bringing it to the managers or something like that [*sic*]. She knew that's suicide to a HR professional's career is to claim a sexual harassment case [*sic*]." Doc. No. 35, Ex. 16 at 15.

E.  Plaintiff Reports to Sun Edison

The Parties disagree about the nature of the events that led up to Plaintiff making a formal complaint against Bathini on October 16. Jacolick had assigned Plaintiff to work on a new-hire-orientation presentation. According to Plaintiff, she was directly responsible to Jacolick, not Bathini, on this project, and she only kept Bathini in the loop for informational purposes. Plaintiff states that she was not given a specific deadline and was told to present the

project whenever she had completed it. [5] When she completed the project, she and Jacolick agreed that she would present the program at a meeting during the afternoon of October 16.

When Plaintiff informed Bathini that she would be presenting the project to Jacolick that afternoon, she claims that he became very angry and jumped out of his chair. He allegedly pointed his finger in Plaintiff's face in "a very hostile, demeaning, and belligerent way" and told her that she was not going to present anything. Doc. No. 35, Ex. 2 at 131-32. Plaintiff told Bathini, "I am not your wife, don't talk to me like this." *Id.* She then said she was going to have lunch and walked out of the office.

Plaintiff claims that this confrontation pushed her over the edge and prompted her to report the ongoing harassment to Lapidus. Instead of going to lunch, she went immediately to Lapidus' office and informed him of the ongoing sexual harassment by Bathini. Plaintiff was visibly shaken, crying and upset; as a result, Lapidus sent her home to relax and told her that Sun Edison would investigate her complaint. She was put on paid administrative leave pending the outcome of the investigation.

Sun Edison disputes Plaintiff's version of these events. According to Sun Edison, even before the day of the confrontation between Plaintiff and Bathini, there were already concerns regarding Plaintiff's performance. Bathini maintains that the project in question *did* have concrete deadlines, and that he had to postpone Plaintiff's deadline several times due to late work. Furthermore, he states that he had communicated with Plaintiff at least twice about missing deadlines associated with this project.

---

[5] By contrast, Jacolick testifies that "it was well known that the expectations were that it was going to be completed within a month." Doc. No. 23, Ex. B at 50-51.

He further contends that, on October 16, when he asked Plaintiff for a copy of the presentation in order to review it before the meeting, Plaintiff refused and instead told Bathini that he would see the presentation when she presented it to the staff during the afternoon meeting. Bathini then told Jacolick about Plaintiff's refusal to give him the copy of the presentation. According to Jacolick, she told Bathini, "Prasad it's your issue. If she's not giving you something you're asking for, write her up. . . . [Y]ou've got to have that. I want [the presentation] at the meeting at 3:00." Doc. No. 23, Ex. B at 90. When Bathini went back to Plaintiff to ask for the copy of the presentation again, the confrontation ensued.

What happened next is undisputed. Bathini reported the incident to Jacolick and stated that he considered Plaintiff's refusal to provide him with a copy of the presentation to be insubordination. He told Jacolick, "either let her go or let me go, otherwise I am going to leave." Doc. No. 23, Ex. C at 127. Jacolick then canceled the 3:00 meeting and contacted Zeigler about the incident, and the two discussed putting Plaintiff on administrative leave to investigate the alleged insubordination. This did not happen, however, once she learned that Plaintiff had made a complaint of sexual harassment against Bathini to Lapidus.

Later in the afternoon, Lapidus, Ziegler and Jacolick called Bathini to a meeting and questioned him in detail about Plaintiff's allegations. He denied engaging in any inappropriate or harassing behavior. Sun Edison put Bathini on administrative leave as well, pending a full investigation into the situation.

F.  Sun Edison Hires Susan Carnell to Investigate Plaintiff's Complaint

On October 17, Sun Edison hired Susan Carnell, who had conducted two similar sexual-harassment investigations in the past, to handle the case. The investigation began with a meeting

between Carnell and Plaintiff that lasted around five hours. Carnell also conducted an interview of similar length with Bathini, and she interviewed a total of fourteen other Sun Edison employees. On October 24, Carnell met with Plaintiff for a follow-up interview. Plaintiff ended the interview early and never returned to complete the interview, despite requests to do so.

According to Sun Edison, Plaintiff said she was not willing to continue the interview and that she wanted to "forget about it" and return to work. Doc. No. 35, Ex. 8 at 27-28. Plaintiff, by contrast, offers a different set of explanation for why she refused a second interview: the first interview went on for five hours with no break; her doctor advised her that it was not healthy for her emotional state to have any further interviews with Carnell; and she perceived Carnell as hostile and biased. *See infra* (describing the grounds for Plaintiff's allegations of bias).

Reflecting on her interview with Bathini, Carnell describes his demeanor and reactions as "shock, horror, gasping, bending over, very upset; very, very upset, voice trembling kind of a thing." Doc. No. 35, Ex. 8 at 82-83. She found his version of events credible in part because she did not think anyone would fake such a reaction. In particular, she was struck by Bathini's "genuine shock" when she explained to him what a "blowjob" was; as a result, she concluded that his claim of not knowing what that term meant was credible. *Id.* at 100-01.

On October 31, Carnell completed her report, which articulated her grounds for rejecting Plaintiff's allegations. Among other things, Carnell found: that Plaintiff was not honest in other contexts, *i.e.*, Plaintiff listed a degree on her resume that she was in the process of earnings, but had not yet obtained; that Plaintiff had an apparent motive to lie due to her performance problems and her confrontation with Bathini; that Bathini was credible in his denial of the allegations; and that witness statements generally supported Bathini's denials. Subsequently, Carnell reported to Sun Edison that she believed there to be several significant discrepancies

between what Plaintiff reported to the police when filing criminal charges against Bathini, versus the facts Plaintiff reported to Carnell during her investigation. *See generally infra* section I.G (describing Plaintiff's criminal case against Bathini).

Plaintiff counters that Carnell and Sun Edison's conclusions reflect hostility, bias, and prejudgment. She maintains that Carnell "became very agitated in those meetings. She crossed and scribbled in her notebook on several occasions. She slammed her notebook down. She said things out of her mouth that I didn't say to her, and when I told her that's not what I said, she became more angry and agitated at those meetings." Doc. No. 35, Ex. 2 at 190.

Furthermore, although Carnell scrutinized Plaintiff's credibility by examining her honesty on matters that were extrinsic to the case (such as her resume), Plaintiff suggests that Carnell did not do the same for Bathini. Bathini's resume indicates that he has an MBA, CPP and Senior Professional of Human Resources ("SPHR") certification; however, his deposition testimony acknowledges that his CPP had lapsed due to lack of participation in continuing education courses, that he had not completed the coursework for his MBA, and that he does not have an SPHR certification because the exam was scheduled during his Sabbath.

Most importantly, Carnell did not inquire about Bathini's criminal history. Three years before Bathini's alleged harassment of Plaintiff, he was arrested and found guilty of harassment, harassment with intent to follow another, and misuse of telephone, and he was given one year of probation. These charges stem from accusations of sexual assault and harassment brought by Beatrice Sammeta, his wife's second cousin.

According to Sammeta, Bathini first assaulted her in a hotel room wherein he coerced her into having sex with him. After that incident, Bathini began calling her relentlessly. Sammeta testifies that Bathini subsequently blackmailed her into having sex with him by threatening to tell

their family that she was a cheap woman who began the affair. When Sammeta refused sex and ignored Bathini, he allegedly came to her house and stole her phone and pager. Bathini called all the numbers he could retrieve from her phone, masked his accent and told people that Sammeta was having an affair. In addition, Bathini allegedly left messages to Sammeta stating that she knew who he was and that if she did not respond, he was going to kill her or run her over.

Sammeta further claims that Bathini not only "wanted oral sex" from her but also pressured her to "videotape it" so he could watch it again later. Doc. No. 35, Ex. 10 at 42. Later, Bathini allegedly tried to blackmail her by threatening to show the video to others.

In June or July of 2005, Bathini allegedly forced Sammeta into his car and sexually assaulted her. Also in July 2005, Sammeta maintains that Bathini followed her to her daughter's dance class and threatened to make a scene. Sammeta had to call her sister to pick her up, but Bathini continued to follow their car until they turned into a police station. Sammeta filed a police report that night and the Court later granted her a peace order against Bathini.

Bathini addresses these issues by claiming that the presiding judge in the criminal case called the charges "ridiculous" in open court, stating that he had "never seen anybody filing this many [charges] against an individual," and that most were "baseless." Doc. No. 35, Ex. 5 at 353. Bathini testifies that the judge "kept a few [charges] and said PBJ, Probation Before Judgment." *Id.*

Carnell did not look into or learn of the facts relating to Sammeta's case during her investigation. She acknowledges in her deposition that had she been aware of the criminal case, she would have changed some of the questions she asked and would also have wanted to speak with Sammeta.

G. Sun Edison Terminates Plaintiff's Employment

Plaintiff filed criminal charges and a petition for a peace order against Bathini on October 29 in Prince George's County, Maryland, alleging assault and harassment. Bathini was arrested on October 31 and released from jail the following day. On December 18, the State's Attorney's Office decided to *nolle prosequi* the charges against Bathini after interviewing him. The charges were dismissed the next day. According to Plaintiff, the Assistant State's Attorney informed her that the County did not have resources to pursue her charges, and her best method was to bring a civil suit against Bathini.[6]

During the pendency of Prince George's Country's investigation of the criminal charges filed by Plaintiff, Sun Edison maintained the status quo by keeping both Plaintiff and Bathini on paid administrative leave. After learning of the charges' dismissal, however, Sun Edison informed Plaintiff in a letter that her employment was being terminated effective December 19. The letter states that, "[b]ased on the results of our independent investigation, the Company has concluded that you made a false allegation of sexual harassment" and that "[t]he Company views that as gross misconduct warranting your termination from employment." Doc. No. 23, Ex. Q. The letter also notes that Sun Edison had additional concerns about Plaintiff's honesty and credibility regarding her resume and other personally identifying information.

Bathini was not consulted on, nor did he participate in, the decision to terminate Plaintiff's employment. He returned to active employment around December 28, 2008.

H. Plaintiff Takes Legal Action Against Sun Edison

---

[6] The Court notes that the decision of a prosecutor to dismiss a case does not necessarily reflect his/her belief that the charges are untrue or unprovable. Whether to indict involves a wide range of discretionary considerations apart from the strict factual merits of the case for liability. *See generally* Leslie C. Griffin, *The Prudent Prosecutor*, 14 Geo. J. Legal Ethics 259, 268-70 (2001) (discussing the factors that enter into discretionary charging decisions).

About two weeks after Plaintiff's termination, Plaintiff filed claims of discrimination and retaliation against Sun Edison with the Prince George's County Human Relations Commission ("PGHRC"). PGHRC conducted an investigation and issued a determination on August 18, 2009. The PGHRC concluded that "there is insufficient evidence to support Complainant's allegation that the Respondent discriminated against her based on her sex (Female) and subjected her to sexual harassment (hostile work environment)." Doc. No. 23, Ex. T at 4. The PGHRC also stated that "there is insufficient evidence to support Complainant's allegation that Respondent terminated her in retaliation for filing a sexual harassment complaint against her Supervisor." *Id.* at 7.

Plaintiff brought this action against Bathini and Sun Edison on January 13, 2010, for sexual harassment, discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"). Sun Edison has filed a motion for summary judgment, which is pending before the Court. *See* Doc. No. 23.

## II.     STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

III.    **ANALYSIS**

   A. Wrongful Termination Based on Gender (Count IV)

A plaintiff can establish a *prima facie* case of gender discrimination under Title VII by either direct or indirect evidence of discrimination. *See Ragsdale v. Potter*, 235 F. App'x. 173, 174 (4th Cir. 2007) (unpublished). Plaintiff has not provided any direct evidence of gender discrimination relating to her termination. Thus, the Court will evaluate the evidence under the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Ragsdale*, 235 F. App'x at 174.

In *McDonnell Douglas Corp. v. Green*, the Supreme Court held that "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case" of discrimination. 411 U.S. at 802. To establish a *prime facie* case of discriminatory discharge, Plaintiff must establish the following: "(1) that [she] is a member of a protected class; (2) that [she] suffered from an adverse employment action; (3) that at the time the employer took

the adverse employment action [she] was performing at a level that met [her] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Sun Edison contends that Plaintiff has failed to establish the third and fourth elements. The Court agrees with Sun Edison as to the fourth element and finds it unnecessary to address the third. Plaintiff has not provided any evidence that a male employee replaced her at Sun Edison after her termination. In any event, Plaintiff has not identified any facts from which a reasonable juror could conclude that her gender had anything to do with the reasons for her termination, apart from her *quid pro quo* sexual-harassment theory of termination. However, that theory is captured in a separate count, which will be discussed at greater length below. Sun Edison is therefore entitled to summary judgment on Count IV.

B. Retaliation (Counts III & V)

To establish a *prima facie* case of retaliation, Plaintiff must show: "(1) that [she] engaged in a protected activity; (2) that [her] employer took an adverse employment action against [her]; and (3) that a causal connection existed between the protected activity and the asserted adverse action." *King*, 328 F.3d at 150-51. If she makes such a showing, the burden shifts to the employer to offer a legitimate and non-retaliatory basis for the adverse action. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001). Plaintiff then has to show that the asserted reason is pretextual in order to survive summary judgment. *See King*, 328 F.3d at 151.

Defendant's motion does not challenge Plaintiff's *prima facie* case for retaliation. Instead, Sun Edison argues that it had legitimate and non-retaliatory reasons to terminate

Plaintiff because it believed in good faith, based on Carnell's investigation, that Plaintiff had committed gross misconduct by making a false allegation of sexual harassment against her supervisor. Sun Edison also contends that the investigation revealed broader concerns about her honestly and credibility relating to her resume and her personally identifying information. Defendant emphasizes that its judgment that Plaintiff was dishonest (and therefore that she must be terminated) need not be correct; it only needs to be Sun Edison's sincere reason for terminating her employment. *See Hawkins v. PepsiCo Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (quotation omitted)).

Sun Edison is correct that courts do not "sit as a kind of super-personal department weighing the prudence of employment decisions made by firms charged with employment discriminations." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (quotation and internal quotation marks omitted). Furthermore, Sun Edison is correct that if it genuinely believes that Plaintiff brought false charges against Bathini, it follows that she committed gross misconduct justifying her termination. Such a reason would be a legitimate and non-retaliatory basis for discharge. *See, e.g.*, *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 745 (7th Cir. 2010) ("An employer is forbidden to discriminate against an employee who participates in an investigation of employment discrimination. But participation doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination. This includes making frivolous accusations, or accusations grounded in prejudice." (internal quotations omitted)); *cf. Martin v. Mecklenburg Cnty.*, 151 F. App'x. 275, 280 (4th Cir. 2005) (unpublished) ("[W]e would be reluctant to conclude that an employer can never dismiss an employee for lying during a Title VII investigation, proceeding, or hearing.")

However, the type of employment decision at issue in this case presents a unique problem. It is undisputed that Sun Edison fired Plaintiff because of the sexual-harassment complaint she filed. Ordinarily, this epitomizes what it means to retaliate against an employee for protected activity. The only consideration that prevents Sun Edison's stated, non-retaliatory motive from being a retaliatory one is that it claims that Plaintiff's complaint is false. The Fourth Circuit has not yet articulated a clear approach for handling cases of this nature. *See Martin*, 151 F. App'x. at 280 (declining to resolve the "difficult issue" of whether, or when, an alleged lie might qualify as protected Title VII activity).

It is exceptionally difficult to disentangle retaliatory from non-retaliatory motives when the reason for termination is the employee's filing of a false complaint, because "the proffered reason for termination is inextricably intertwined with the protected conduct at issue." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1022 (8th Cir. 2011). This can be seen by comparing the factual configuration presented here to a more typical scenario. Often, courts are presented with situations where an employee arguably has some performance-related problems, experiences some sort of discrimination (whether harassment or otherwise), engages in protected activity to report the discrimination, and is subsequently fired. In these cases, plaintiffs contend that the employer terminated them in retaliation for their protected activity, and the employer counters that the termination had nothing whatsoever to do with their protected activity; instead, the termination was based on the employee's ongoing performance problems, *etc. See, e.g.*, *id.* ("The honest belief doctrine typically applies, however, when the employer raises a ground for termination unrelated to the protected conduct at issue.").

Courts can resolve such cases by giving appropriate deference to the employer's performance-related concerns while nonetheless detecting cases where the employer's asserted

reason may be a pretext for retaliation. They do this by considering factors such as whether the termination occurred soon after the protected activity; whether key decision-makers knew about the protected activity; whether the performance-related problems were longstanding, such that the employer had tolerated them for a long time, and suspiciously ceased tolerating the performance deficits around the time the employee engaged in protected activity; *etc.* All of these facts help courts distinguish cases where performance concerns are genuine from those in which they are a mere pretext for retaliation. *See, e.g.*, *Price v. Thompson*, 380 F.3d 209, *passim* (4th Cir. 2004) (analyzing various kinds of circumstantial evidence that help courts determine whether employer's motive is retaliatory or legitimate in cases where the legitimate motive is unrelated to protected activity).

However, none of those sorts of facts are available or relevant in this case. The question here is not whether there is a causal link between the protected activity and the adverse employment action: there indisputably is such a link. The only question is whether the employer fired Plaintiff for the mere fact that she complained, or for the further reason that her complaint was false. Detecting pretext and retaliation will necessarily be more difficult here than it is in the typical case. Faithful application of *McDonnell Douglas* will therefore require more careful scrutiny of the Defendant's asserted grounds for termination than would be appropriate in other contexts.

There is an additional reason to interrogate the Defendant's asserted grounds for termination less deferentially in this context than elsewhere. Here, the basis for termination rests on a straightforward question of historical fact: who is telling the truth—Plaintiff, or Bathini? Did Bathini sexually harass her in the manner she claims, or are her allegations a complete fabrication, as Bathini suggests? Resolving questions of this nature lie squarely within the

institutional competence of the judiciary and are "normally the province of a fact-finder at a sexual harassment trial." *Gilooy v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 741 (8th Cir. 2005). Thus, Sun Edison's rationale for firing Plaintiff is substantially different from the performance-related motives that employers often assert in Title VII cases, and less deferential review here does not raise a parallel concern about courts sitting as a "super-personnel department weighing the prudence of employment decisions." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (quotation omitted).

This is not to say that employers are liable for retaliation whenever they take adverse action against an employee based on an honest (but mistaken) belief that an employee has brought a false charge of sexual harassment. In light of the considerations discussed above, such a theory would not be completely implausible or beyond the pale: the EEOC advanced such a position (unsuccessfully) before the Eleventh Circuit in *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000), and this Court is not aware of any cases in which the Fourth Circuit has considered the theory and rejected it. Nevertheless, Plaintiff has not articulated such a position, so the Court declines to consider it.

Instead, Plaintiff has limited herself to the theory that Sun Edison did not honestly believe that her allegations were false, or, at the very least, that Sun Edison's hostility to her allegations led it to prejudge the outcome of the investigation before it had begun. The Court agrees that Plaintiff has raised a dispute of material fact as to whether Defendant's asserted reason for firing her—the falsity of her sexual-harassment allegations—is a pretext for the real motive of hostility to her protected activity.

The Court acknowledges that reasonable jurors may well agree that Carney's investigation was adequate or that, despite its inadequacy, Sun Edison terminated Plaintiff on the basis of an honest belief that Carney got the answer right. However, there are sufficiently serious (albeit arguable) defects in Carney's report and testimony to enable reasonable jurors to draw the opposite inference as well. First, Carney apparently neglected to check the public criminal records to see if Bathini had been charged with similar acts in the past. If she had done so, she likely would have found the charges brought by Sammeta, which, though by no means identical to Plaintiff's allegations, do contain substantial points of similarity that could be seen as bolstering Plaintiff's credibility.

Second, Carney claims to have found Bathini credible for reasons that jurors might deem quite incredible: for instance, her stated belief that Bathini honestly did not know what a "blow job" meant after having lived and worked in America for over two decades.

Third, Carney and Sun Edison arguably used double standards in evaluating witness credibility by scrutinizing Plaintiff's resume for dishonesty regarding her qualifications while ignoring similarly overinflated qualifications on Bathini's resume.

More generally it is possible that after hearing the testimony of all witnesses at trial, reasonable jurors may conclude that the purported credibility determinations of Carney and Sun Edison regarding Plaintiff and Bathini are so wildly off the mark that they suggest bias, prejudgment, and hostility against Plaintiff's protected activity. Carney's report is fundamentally based on an assessment of the relative credibility of Plaintiff and Bathini. Generally, "when an employer is presented with a 'he said, she said' set of facts involving two employees, and the employer chooses to disbelieve and discipline the employee who had engaged in protected

opposition to unlawful activity, then the employee's claim of retaliation must go to a jury [and] [t]he jury must decide whether the employer took the adverse action because of a good faith belief that the employee made false accusations . . . or because the employee opposed unlawful activity." *Richey v. City of Independence*, 540 F.3d 779, 785 (8th Cir. 2008). Therefore, Sun Edison is not entitled to summary judgment on Counts III and V.

C. *Quid Pro Quo* Sexual Harassment (Count II)

To establish a *quid pro quo* sexual-harassment claim, Plaintiff must demonstrate that: "(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) Plaintiff's reactions to the harassment affected tangible aspects of compensations, terms, conditions or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action." *Rachel-Smith v. FTData, Inc.*, 247 F. Supp. 2d 734, 745 (D. Md. 2003). Sun Edison challenges Plaintiff's ability to establish the fourth element of the *prima facie* case.

To satisfy the fourth element, a plaintiff must "provide evidence of 'a nexus or casual connection between the acceptance or rejection of the unwelcome sexual advances and the employment decision complained of.'" *Bush v. Potter*, No. AW-06-959, 2009 WL 5177286, at *7 (D. Md. Dec. 21, 2009) (unpublished) (quoting *Briggs v. Waters*, 484 F. Supp. 2d 466, 479 (E.D. Va. 2007)). Sun Edison contends that Plaintiff cannot identify a connection between the termination of her employment and her refusal to succumb to Bathini's alleged sexual advances. In particular, Sun Edison emphasizes that the decision to terminate Plaintiff was made by Lapidus, Jacolick and Zeigler; Bathini was not involved. Thus, Sun Edison concludes that

Plaintiff's refusal to submit to Bathini's alleged sexual advances had no bearing on her termination.

However, Sun Edison incorrectly assumes that an alleged harasser's lack of direct role in the termination decision-making process necessarily defeats causation. Rather, an indirect but nonetheless substantial role in the final decision can establish such a connection as well. The Court will consider "[t]he circumstances surrounding the employment decision, including the close temporal proximity between the sexual advance and employment action or whether the harasser made or influenced the decision . . . in its analysis of the fourth element." *Id.*

According to Plaintiff, after being repeatedly rejected by her, Bathini made it clear to her that her life would be better if she submitted to his demands. His harassment continued when Plaintiff was working on the new-hire-orientation project in her cubicle on October 8, 2008; on that occasion, she rejected him again. Bathini's alleged outburst against Plaintiff happened eight days later, and he promptly reported her to Jacolick for insubordination following that confrontation. When reporting Plaintiff to Jacolick, Bathini did not mince his words: on his own account of the events, he told Jacolick, "either let her go or let me go, otherwise I am going to leave." Doc. No. 23, Ex. C at 127. Jacolick took Bathini's concerns very seriously: she canceled the new-hire-oriented meeting, discussed the situation with Zeigler, and was preparing to place Plaintiff on administrative leave to investigate Bathini's claims until Lapidus informed her of Plaintiff's sexual-harassment allegations.

Even though Bathini did not ultimately take part in the three-person panel that rendered the final decision to fire Plaintiff, it would not stretch the bounds of rationality for a juror to conclude that Bathini's words to Jacolick contributed to her negative view of Plaintiff and,

thereby, to her termination. Likewise, a reasonable juror could find that Bathini's words to Jacolick were substantially motivated by his frustration over her "insubordination" for refusing his sexual demands. A juror who accepted these two findings could justifiably infer that Plaintiff's refusal of Bathini's sexual advances substantially, if indirectly, influenced her termination.

Certainly, Sun Edison may ultimately convince the jury that Bathini never requested sexual favors from Plaintiff; or that he did request such favors, but that her refusal is not what drove him to complain about insubordination to Jacolick; or even that Bathini did possess illegitimate motives when he complained about insubordination to Jacolick, but that his complaint had no influence on the Lapidus-Jacolick-Zeigler termination decision and therefore no causal relation to a tangible employment action. However, "[t]he question of which of this competing evidence is more credible is not for this court to decide on summary judgment; rather, the relevant question at this juncture is whether a rational factfinder could conclude, based on the present record, that Plaintiff was the victim of *quid pro quo* sexual harassment." *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 393 (D. Md. 2010). Summary judgment is therefore inappropriate on Count II.[7]

D. Hostile Workplace Environment (Count I)

To state a *prima facie* claim of hostile-workplace-environment sexual harassment, a plaintiff must allege that: "(1) she experienced unwelcome harassment; (2) the harassment was based on her gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for

---

[7] The Court therefore finds it unnecessary at this juncture to address Plaintiff's other *quid pro quo* theory, *i.e.*, that the only reason she was able to keep her job for as long as she did was because she stayed silent about, and thus in some sense acquiesced in, Bathini's sexual advances.

imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). Sun Edison does not dispute that Plaintiff has established a *prima facie* case. Instead, it requests summary judgment based on the affirmative defense set forth by the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). To prevail on the *Faragher/Ellerth* affirmative defense, the employer must demonstrate that: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

However, the *Faragher/Ellerth* defense is not available to an employer when a "supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Pitter*, 735 F. Supp. 2d at 394 (quoting *Faragher*, 524 U.S. at 808). Here, as in *Pitter*, the alleged harasser did not "unilaterally . . . terminate [Plaintiff's employment," but the termination decision was, arguably, "based [in part] on his report of what occurred." *Id.* at 395. Because there is a genuine dispute of fact regarding whether Bathini's alleged harassment "culminate[d] in a tangible employment action," *Faragher*, 524 U.S. at 808, as was demonstrated above, *see supra* section III.C, there is also a genuine dispute of fact as to whether the *Faragher/Ellerth* defense is available to Sun Edison.

In any event, Plaintiff has presented facts that give rise to a genuine dispute regarding both central elements of the *Faragher/Ellerth* defense. Plaintiff waited several months to report Bathini's alleged harassment because of her fear of retaliation. A fair case can be made that her concerns were not idle speculation or a "generalized fear of retaliation," *Bush*, 2009 WL 5177286, at *7, but rather were based on concrete experiences and stories of co-workers who

suffered retaliatory employment action and were not taken seriously when they came forward with allegations of harassment. She spoke with several friends and co-workers to reason through her fears and determine whether she could safely report the situation to anyone in the company. She determined that she could not. The Court is not prepared to conclude, based on the facts presented, that a reasonable juror would necessarily have to conclude that Plaintiff's fears of retaliation, and her resultant delays in reporting, were irrational. Thus, Count I will also proceed to trial on the merits.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Sun Edison's motion for summary judgment. Doc. No. 23. A separate order will follow.

    July 15, 2011                                          /s/
        Date                                    Alexander Williams, Jr.
                                                United States District Judge